Our first case this morning is Stant Manufacturing v. Gerdes. Mr. Tyler. Thank you Your Honor. My name is Lynn Tyler and I am representing the plaintiff at Stant Manufacturing Inc. May it please the court, I'd like to begin by addressing the 086 patent, which is the lost motion with the minimum number of parts. We believe there is infringement of that patent by all versions of Gerdes Caps as a matter of law. I'll start by noting that the structure of the caps and the function of the Gerdes Caps is undisputed. We have drawings in our brief that were prepared by Gerdes Council and of course the court has samples of the caps also. Is this your issue about whether or not it's the terminal end of the appendage that has contact with the driven lug? Yes it is, Your Honor. And it's our view that... But you didn't appeal the claim construction of the word appendage, did you? There was no construction of the word appendage, Your Honor. Did you ask for one by the district court? Neither side asked for a construction of appendage and we believe under the Eli Lilly case therefore the ordinary meaning applies. There was testimony at trial by our expert, Mr. Reagan, that the ordinary meaning of appendage is a typically smaller part attached to a larger one. There was a dictionary definition submitted in conjunction with the Markman proceedings largely to the same effect. And so with the Gerdes Cap there is the ratchet stop which we believe is the relevant appendage. The claim states that the purpose of the appendage is to rotate the closure and it's the ratchet stop in the Gerdes Cap that performs that function. But why aren't these unitary structures a single appendage? Excuse me? Why aren't these unitary structures a single appendage? Well we believe that's because... I mean you're giving them different names but it's just a unitary structure. Well the whole handle is a unitary structure for that matter. So there is a certain artificiality to carving up the one piece handle into different parts but we have to do that for purposes of the claim. And the structure, I mean they've given it different names to different parts of the offset pin. They've called one part of it the ratchet stop and they've called one part the offset pin. They have different functions. The ratchet stop, the function of that is to turn the closure and the spring holder... Because the jury found that models two through four don't infringe. So the jury obviously found or we have to presume factual findings that support the jury verdict if we don't know. So the jury clearly concluded or I think we have to presume that this was a single appendage and the contact point was not at the terminal ends for number two, three and four. How do we get around that? Well because the structure is undisputed and so there's nothing really for the jury... The structure is undisputed? Well I don't understand the appellee as suggesting that these are two separate appendages. So I don't think the structure is undisputed in terms of how the jury should construe whether or not the accused device is an appendage within the meaning of the claim term. Well the physical structure is undisputed. I mean we're disputing whether it's you know whether it should be viewed as two parts or one but what's actually the actual physical structure is undisputed. But whether it should be two parts or one is all a question of how the accused device maps on to the claim elements which seems to me to be part of the infringement analysis i.e. a factual question for the jury to decide. It's not a matter of claim construction. This is a matter of is this thing in the accused device a single appendage or two separate appendages and the jury found it's one. The jury, I mean everybody agrees the jury found it's one structure. I guess it's our view that that is not a factual question for the jury to decide because the structure is undisputed.  Well we do agree though that we're discussing the structure of the accused device and isn't that always a factual matter. Well the accused device before the court are the drawings of it so no one's disagreeing as to what it looks like. That's our point. So anyway yes the ratchet stop performs the function of turning the closure and then what they're calling the spring holder pin that is there to hold the spring which is not relevant to the claims of the 086 patent. The 086 patent is not one of the ones that has the direct drive guaranteed by having a spring. So we view the spring holder pin as irrelevant additional structure that doesn't count for purposes of infringement and all the drawings in exhibits 805 through 808 show that the driven lug contacts the ratchet stop at the terminal portion at the very end in every version except the last one in which case it's within a millimeter or roughly a 40th of an inch. Well why can't two items together form an appendage as the jury seems to have found? Well we have to look at what the definition of appendage is and the definition of appendage is... We've already been through that. We don't have a binding definition but why can't two items form an appendage? Well the question is... So I'm asking even taking your point of view can't we still reach the same conclusion the jury did? I don't believe so because the question is does it have an appendage? The ratchet stop is an appendage. If it has another appendage or if the appendage has an appendage or if you can view it as a bigger appendage that's all irrelevant to whether it has the appendage that the claim calls for which is a single appendage that performs the function of rotating the closure. And so then Gerdes has some other arguments that they use to try to get around this conclusion of infringement as a matter of law and those are that the handle is not part of the top wall and we believe that's inconsistent with just the plain reading of the claim where the claim says there's a shell and the shell has a cylindrical side wall and a top wall. That's all. So that if it's not part of the cylindrical side wall it's part of the top wall and the handle is part of the top wall. It also says the handle is formed on the top wall. The specification says the handle is formed in the top wall and the district court found that the handle was part of the top wall. The claim says that the top wall is bounded by the cylindrical side wall and that's only true if the handle is part of the top wall too. So for all those reasons we think the plain reading of the claim and the specification support that the handle is part of the top wall. Then Gerdes has an argument based on prosecution history to try to get to the same conclusion that the handle is not part of the top wall. Actually a slightly different one and that's based on Stantz's earlier 733 patent which had the lugs on the side wall and the examiner was confused about that point. He thought that some ramps that are on the underneath of the top wall were the lost motion lugs and so Stantz corrected that misunderstanding and said no it's actually these lugs on the side wall and Gerdes is pointing to that as disclaiming the side wall of the handle as being part of the top wall which we don't think an accurate description of a prior art device is a disclaimer. It's talking about a different side wall and further that wouldn't even escape infringement for Gerdes because theirs would still be attached to the underside of the handle. And lastly we think they weighed that because that's a different claim scope. They're just trying to exclude the side walls. They're not trying to exclude the entire handle. And then their final argument is based on Stantz's earlier 505 patent where they misconstrue that the drive lug there is not attached to the handle it's attached to a barbed probe which goes in what's called an appearance cover 70. That first lost motion design was based on a locking cap so it had a hole in the center where the lock cylinder went and they took that out and put this probe in there that the drive hub is attached to so it's not even attached to the underside of the handle. So we think that one misses the mark also. Then quickly under the 055 patent where the jury found that it was on sale everybody's agreed there's only two pieces of evidence that could make this on sale. One is exhibit 373 which is a quotation and we think that evidence shows that did not relate to the 883 prototype which is the subject of the patent because Stantz said right on exhibit 373 on the third page that it was... There's a particular lot number that coincides exactly though isn't there? Yes and that shows... Why wouldn't that be sufficient evidence for the jury to rely on? That is sufficient evidence to conclude that Ford asked for a quote on the 883 but Stantz did not provide one. On the third page of that exhibit Stantz said the 882 is being replaced by 883 and we will complete this form when the 883 is released and then there are several pieces of correspondence later in June which show that the 883 was not released by Ford until June and Stantz did not quote until June. Then the other key transaction is the 50 prototypes that were sold and the evidence there shows it's experimental. It was an experimental quantity of only 50 parts where these are sold in the millions. It was an experimental price of $72 when the commercial price is $2 to $5. The buyer was the engineer not the Ford commercial buyer. Stantz made changes throughout the progress of this experimentation from the 882 to the 883 and then from the 883 to where they reversed the order of the pins and the lugs. And the EZDOT case says that changes during experimentation that result in claimed features are strong evidence of experimentation. So for all those reasons we think that there's no substantial evidence. It's certainly not clear and convincing that this was on sale. I see I'm already into my rebuttal time so if there are no questions I'll sit down. Thank you. Thank you. We'll hear from Mr. Elkind. Concerning terminal portion, there was no dictionary definition of appendage presented at trial. There was a dictionary definition at the Markman but both sides elected not to present a dictionary definition at trial. If you look- What did the jury find? The jury found what I- The questions you're asking I think answer what the jury found. The jury found that it was a single appendage in versions 2 through 4 and that it was not engaged at the terminal portion. That's what one would expect the jury found from the verdict. If you look at the drawings alone, you can see that there's substantial and persuasive evidence for the jury verdict. If you just look at the offset and consider it as an appendage as a whole, you see it is not hit at what could clearly be determined to be the terminal portion. Also, when you look at the claim language that says the appendage is supported at one end and then there's a terminal portion, the normal interpretation of that would be to look at the other end. If you look at the words of the claims too, I think you come to the same conclusion. You look at the drawings, you look at the words, the jury came to the right conclusion and certainly it's a conclusion that had evidence in the record to support it. On top wall, I want to- I'm sure you understand, but I want to make clear that the only infringement of any valid claim that the jury verdict found were the claims of the 086 patent. And the Gerties version 1 has the offset pin or the appendage mounted in the handle of its cap. Now there's no dispute between the parties that if the handle is not part of the top wall that there is no infringement. That's not in dispute. What is in dispute is the claim construction. The claim says that the appendage is cantilevered downwardly from the underside of the top wall. Therefore, if the top wall- if the handle is not part of the top wall, the Gerties product version 1 does not meet that limitation. And this is only a literal infringement analysis too because Stant was barred by a motion in Lemonade that was granted from any equivalence infringement of this limitation. Why was the claim construction wrong? With all due respect, if you look at the words of the claim, it separately sets forth the handle after it sets forth the top wall. To somebody drafting a patent claim, that means it's a separate element. And it does say formed on the top wall, but I would submit that if you take that language as a whole, looking just at the claim, you would consider it a separate element. The specification, on the other hand, is ambiguous. There's one line in the specification that says the handle bisects the top wall into two semicircular portions. Well, if the handle bisects the top wall, it's not part of the top wall. And there's other language that goes the other way. So what we would conclude is that the specification is ambiguous, but that the claim, as amended and as argued, resolved the ambiguity and recited the handle as separate from the top wall. And the prosecution history is consistent with that because in making the amendment and in the remarks, the 505 patent, Stant's prior 505 patent, was distinguished over. And that patent has the hub mounted in the handle. And that's consistent with the handle being separate in order to distinguish over that in the prosecution history. I don't think this is really an athletic alternatives type case where you have two reasonable meanings of a claim term and you choose the narrower one. I think the claim language itself resolves the meaning. Now turning to the sale of the AA-3, which the jury found a commercial sale and or offer for sale more than a year before the 055 patent application was filed. There are several grounds for that. First of all, as you have noted, there's an RFQ from Ford, a request for quotation and a response. It's a signed response. Stant's, I think, only argument against that is it's not for the AA-3. But right on the cover page, there are two numbers, an AA number and an NCOII number. It's N-C-O-O-I number. And they both line up with the drawing for the AA-3. You heard Mr. Tyler explain that that was merely a request for clarification. They did not make an offer on that particular lot number until after the critical date. The front page has the numbers on it. It is the RFQ. It is the front page that is signed. There's a price on it. If you sign the front page of an RFQ and it's got those numbers on it, that's certainly substantial evidence and persuasive evidence that it's for the AA-3. Certainly the jury had a right to find it so. And I note that the district court focused on that in the JMOL motions, that particular item also, the RFQ and the response. Beyond that, there were sales of high-priced prototypes. So in connection with the prototypes, the stand argues at some length in its brief that this was an experimental use exception here. Although it's true that Ford was a customer of Stand, the whole purpose of this transaction, the prototypes, was to test the crash effectiveness of it, if you will. Right. Well, first of all, there are... I mean, Stand couldn't conduct those kind of tests itself. It had to go to Ford. There are high-priced prototypes, and there's cases like Cargill which say that high-priced prototypes are indicative of something commercial. You know, why were they charging for them? Why was it such a high price? Let me answer that two different ways. You can charge for an experiment, can't you? You can, you can, but let me answer it two different ways. That's our Manville case, among others. You can. They charged for it after it was successful in Manville. They didn't collect any money until it was successful. But let me answer that a couple ways. First of all, the whole relationship between Ford and Stand was dripping with commercialism from the beginning. There was negotiation of tooling costs even before the prototypes were sold. There were the high-priced prototypes. There was the RFQ and response procedure. It was a commercial relationship. Even though there was development going on, it was a commercial relationship. There was a prior cap, the AA-2, which isn't really of concern to this appeal, but it's interesting that that went through the same procedure with high-priced prototypes and an RFQ and a response. And there's sort of an interesting document in connection with the AA-2 where Stand says, okay, now we can bill Ford for a lot of money because we've delivered these prototypes. But there's another reason, too. There was a reduction to practice of this device before it was provided to Ford for the crash testing. Stand had their own billion-dollar laboratory. Are you saying that this testing, the crash testing, was particularly directed to Ford's needs as opposed to Stand's? Yes, it was very customer-specific. There's also nothing in the claims that even talk about the fuel cap being for a vehicle or a moving vehicle. There's no recitation in the claims that would lead one to consider the crash testing something that would block general utility. But isn't it pretty clear from the spec as a whole that we're talking about a vehicle part, isn't it? The spec indicates it's for a vehicle, but there's nothing in the claims. And they drafted the claims. They could have drafted claims talking about a vehicle, talking about the characteristics that it needs to have to satisfy a crash test. There's also law that something like the crash test should be recited in the claim if it's going to block a reduction to practice. And in fact, there's also cases on inherency, durability, where durability is something that's considered inherent in a claim. Crash testing is not like durability. I mean, everything has to be durable, almost. Crash testing is very customer-specific and a very, very extreme test. It has nothing to do with the language of the claims. So I would say another reason is there was a reduction to practice. Stan, really, Mr. Tyler hasn't mentioned that they have to prevail on priority on the jury verdict as well as on the 8A3 sale to overcome the verdict that claim 38 is invalid because there's another on sale admitted in a prior case that would invalidate that if there's no priority. One aspect of their argument is that the lost motion mechanism clause should not be interpreted as a means plus function clause. Let me state a couple of points about that. Lost motion is a purely functional word. It's a functional result. It's not like a detente, which is a structure. It's not like a baffle, which is a structure. It's not like a detector, which is a structure. Those are all other cases in this court. They are different, and the trial court recognized that. He focused on it, and he did the right thing. In addition, mechanism is generic and connotes no more structure than means. That's the MIT case, and I'm sure it's been said in prior cases than the 2006 MIT case. Additionally, lost motion mechanism indicates some degree of complexity. I mean, you read that claim, and you say, okay, that's nice, it's a lost motion mechanism configured to provide a driving connection between two pieces. Now what does it look like? It's not like a compression member, which is another case this court has decided. Recall, in that case, the compression member also, in the claim, fit into a cylindrical opening. It had to fit against the screw head. There was a great deal of structure that limited it. That has the aura of simplicity, not like a lost motion mechanism. Let me just mention on inequitable conduct. The trial court decided that Stant had a basis for the representation to the examiner that the military cap did not operate as a breakaway cap. That was not the Gurdie's case. The Gurdie's case was that the basis for the representation was the material information that was never disclosed, and it should have been disclosed. That material information was that definition of breakaway was tied to the tip test, which had nothing to do with the claims or that patent. Do you think they intentionally withheld all that information, however removed it is from the patent itself? They were discussing it 15 months after they made the representation because they were so worried about it, and they never disclosed it. Can I reserve the rest of my time? If you have another question, let me know. No, no, that's fine. Your time is yours to use, Mr. Tyler. Thank you. First, going back to the 055 and the on-sale issue, there was no reduction to practice. I think it's undisputed that there has to be actual crash testing before anyone can know if these will function in the intended environment. Stant does do their own kind of test, but Stant cannot predict how a prototype car body is going to react. You're saying that Stant is the only person or the only entity that could conduct this kind of test was an automobile manufacturer, in this case Ford, and that even though Ford obviously is a valued customer of Stant, that doesn't wipe out the experimental use. That's exactly right because they have to be tested on specific prototype cars that are being designed, the cab is being designed. What about the point, though, that there is nothing, as Mr. Elkin said, there is nothing in the claims with respect to a crash? It does talk about breakaway, that's certainly true. Sure, there are cases, though, that, as I'm sure you're aware, say that you can test an inherent feature of a product, and the crash worthiness is an inherent feature, in our view, of an automobile fuel cap. This is just like we said in our brief, in the EasyDock case they didn't have to test it in rough water if it's a dock, and in the Manville case they didn't have to test lights in Wyoming, because you don't need harsh weather conditions, or lights to survive harsh weather conditions. They could have been in Miami or San Diego, so in our view it's just like those cases. You would perform two kinds of testing on the caps, just not crash testing, right? You did the tip test, remind me of the other two kinds, the kinds that you could do in the lab. Yeah, the tip test and the ball drop, those aren't the only ones. But you had done both of those on these caps, only the crash testing hadn't been done, is that right? How predictive are the tip testing and the ball drop of whether something will be crash worthy? How predictive? Is there evidence in the record of how predictive they are? Well, the evidence shows that the AA2 failed, and ultimately the AA3 failed as well. Those are individual instances, is there sort of evidence of the general predictability of those tests? No, not that I'm aware of. Nothing beyond those specific instances. Also, I think you were making a good point, Your Honor, about the specification makes clear that it's for an automotive use, and the Union Oil case that's cited in the briefs I think goes along with that. If I can turn quickly to the priority of the 806 patent, I think the lost motion mechanism is not a means plus function, and the best case on that is the Lighting World case. They applied three tests there, and we passed them all. One, the people of skill and the art understand the term to denote structure. The undisputed testimony at the marketing hearing for Mr. Harris was yes. Does the dictionary show it denotes structure, even if the structure describes the function? The dictionary said it's a lag with a driver and a follower, a delay. Lag and delay are nouns. They denote the structure of the driver and followers there. And also, what about the spec? The specification of the 806 refers to lost motion mechanism 58, a reference numeral, and points to specific structure, not to anything that will perform the function. Finally, on the inequitable conduct, C page 15 of our brief for Mr. Harris testified that it will not break and retain a seal under any condition. There was no secret definition. Unless there are any questions, I'll conclude my argument. Thank you, Mr. Tyler. Thank you. Mr. Elkind. Just by way of clarification, the 055 and 806 don't have anything about breakaway in the claim at all. They have absolutely nothing about crash testing, nothing about fuel caps for vehicles or anything like that. Can you move to your cross appeal at this point, Mr. Elkind? Excuse me? Can you move to your cross appeal at this point? Okay. Let me turn to the inequitable conduct then. If you look at the impact on the 931 patent in the record, that impact can be applied to the military cap. The military cap has the same upper portion that was designed to break under that impact. It's the civilian cap, the top of it.  The evidence would show that the military cap should act as a breakaway cap under that 931 test. And the fact that they relied on the tip test supports the inequitable conduct. There's evidence in the record that it would operate as a breakaway cap, and they withheld that information. And in a brief to the magistrate on a waiver issue, they said the information was intended to go to the patent office, and again, they never sent it to the patent office. That I'll conclude right on my time. Thank you, Mr. Elkind.